**UNITED STATES of America, Appellee,**

v.

**Arnold N. MAHLER, Appellant.**

**No. 467, Docket 30374.**

United States Court of Appeals
Second Circuit.

Argued June 17, 1966.

Decided July 26, 1966.

---

Arthur Levine, New York City, for appellant.

Stephen L. Hammerman, New York City (Robert M. Morgenthau, U. S. Atty. for Southern Dist. of New York, Michael F. Armstrong, Jack Kaplan, Asst. U. S. Attys., on the brief), for appellee.

Before HAYS, ANDERSON and FEINBERG, Circuit Judges.

FEINBERG, Circuit Judge:

Appellant was convicted below of knowingly giving false testimony to Securities and Exchange Commission ("SEC") investigators, and of conspiring to do the same, under 18 U.S.C. §§ 371, 1001 (1964). He was sentenced to two years' imprisonment on each count, the sentences to run concurrently. We affirm.

There is no attack on the overall sufficiency of the evidence, and a brief background statement will clarify appellant's principal contention, which relates to an overt act. The jury could have found the following facts from the government's case: Appellant owned and controlled Broadwall Securities, Inc., a brokerage firm engaged in the public sale of securities. In late October 1964, appellant met with members of another brokerage firm in Miami. It was there agreed that the latter would supply Broadwall with stock of Bankers Intercontinental Investment Co., Ltd., and that Mahler would take care of selling it to the public; a substantial "kick-back" for each share sold would go to Broadwall. In early November, appellant informed Broadwall's cashier-bookkeeper, Jack Einiger, of the mechanics of the kick-back arrangement. Appellant then told his five salesmen that they would receive an "under-the-table" cash bonus of 17–20% of the sales price for each share of the stock they sold. For the six weeks ending December 11, 1964, Broad-wall's salesmen sold this stock almost exclusively, charging their customers a normal commission based on the minimum New York Stock Exchange rate. In addition to their normal pay, the salesmen received from Mahler the promised cash bonus, which amounted to a total of over $27,000 for the six-week period. All of these transactions were carefully reviewed each week by Mahler, the salesmen, and the bookkeeper; Mahler instructed the latter to destroy records of the under-the-table payments, and warned the salesmen to conceal the payments by putting the cash in bank vaults and not telling anyone they had been paid in cash. On December 11, 1964, appellant was subpoenaed to testify before SEC investigators. He met with the bookkeeper and the salesmen before testifying on that same day and again immediately afterwards. In his testimony under oath to the SEC investigators, appellant stated that he was paying his salesmen only the regular commission reflected on a customer's confirmation; he denied under-the-table payments. After his SEC appearance, appellant told the others about his testimony and advised them that there would be no problems so long as everybody "stuck together." On December 21, the others were served with SEC subpoenas, and Mahler repeated his advice. On December 23, the bookkeeper and four salesmen testified before the SEC investigators. Two salesmen denied that they had received additional compensation for selling the stock; the bookkeeper testified that he was unaware of whether this was so.

Five overt acts were alleged in the conspiracy count (count one) of the indictment; one was Mahler's testimony on December 11, 1964; three of the remaining four were the just-mentioned testimony of the bookkeeper and the two salesmen on December 23, 1964. The remaining overt act was the testimony of another salesman, but was not proved at trial. Count one named Mahler, the bookkeeper, and three salesmen as defendants and alleged that they and two

other salesmen (named only as co-conspirators) conspired "from, on or about" December 11, 1964, up to December 28, 1964, to violate 18 U.S.C. § 1001. Prior to trial, all defendants but Mahler pleaded guilty to count one.

■■ Appellant's first argument is that submission to the jury of overt act one, appellant's SEC testimony, was an error requiring reversal. Appellant claims that the evidence shows, as a matter of law, that any conspiracy to give false testimony to the SEC could not have been formed until after Mahler testified on December 11; therefore, Mahler's testimony could not have been in furtherance of that conspiracy. Since there is no way of determining whether the jury reached its verdict solely because of overt act one, appellant concludes that the verdict cannot stand. The government replies that the point was never raised at trial and, therefore, should not be considered now, that any error was harmless because overt acts three, four and five were clearly established, and that, in any event, the conspiracy alleged was in existence prior to Mahler's testimony on December 11.

We feel that the last point is the most telling and is dispositive. There is no doubt from the evidence that the kickback scheme was in operation well before December 11, and that all involved agreed to destroy any possibly incriminating records and to conceal the fact of cash payments. Assuming *arguendo*, however, that this would not suffice to prove a conspiracy specifically to give false information to the government, it provides the background leading to the crucial facts. These are that on December 11, 1964, Mahler was suddenly served with an SEC subpoena to testify that day and that he immediately met with the bookkeeper and his salesmen to discuss the subpoena. Mahler told the others that there was nothing to worry about and he would find out the matters

in which the SEC was interested. The jury could reasonably have inferred that at that time all of the conspirators understood and tacitly agreed that Mahler should conceal the one fact they were all most anxious to hide—the existence of the under-the-table cash payments. United States v. Mack, 112 F.2d 290, 292–293, (2d Cir. 1940). It should be remembered that we have here not the usual amorphous collection of scattered alleged conspirators with defendant claiming—and perhaps correctly—that there is no single common conspiracy at all.[1] Mahler's group was tightly organized, well-run and limited in number and duration—almost a classic case of conspiracy. We find that there was sufficient evidence that Mahler's testimony before the SEC was in furtherance of a conspiracy already in existence to violate 18 U.S.C. § 1001; accordingly, no error was committed in allowing overt act one to go to the jury. Moreover, appellant never urged below the argument he raises here. Therefore, we hold alternatively on these facts, where the evidence of guilt was overwhelming and the evidence as to overt acts three, four and five was clearly sufficient, that appellant has not overcome the burden of demonstrating "plain error." United States v. Indiviglio, 352 F.2d 276 (2d Cir. 1965) (en banc), cert. denied, 383 U.S. 907, 86 S.Ct. 887, 15 L.Ed.2d 663 (1966). Under this view of the case, it is not necessary to deal with the government's further argument that it was harmless error to submit overt act one to the jury so long as other overt acts were proven. Compare United States v. Bletterman, 279 F.2d 320, 322 (2d Cir. 1960), with Cramer v. United States, 325 U.S. 1, 36 n. 45, 65 S.Ct. 918, 89 L.Ed. 1441 (1945).

■ Appellant also claims prejudicial curtailment of cross-examination of cashier-bookkeeper Einiger, who was an important government witness. Toward the end of a not insubstantial cross-ex-

---

1. E. g., United States v. Borelli, 336 F.2d 376, 385 (2d Cir. 1964), cert. denied, 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965).

amination,[2] defense counsel asked Einiger about his plea of guilty to count one of the indictment, which charged him as a co-conspirator and co-defendant. After bringing out that Einiger had not yet been sentenced, counsel asked him whether anybody had promised him any consideration in connection with imposition of the sentence. After a negative response, counsel asked if his lawyer had told Einiger anything with regard to the penalty in the event he was to plead guilty. An objection was overruled, and Einiger answered he had been told that he could have easily been sent to prison. Counsel asked whether the lawyer told Einiger that if he testified for the government after pleading guilty he might receive some consideration. The witness answered "yes," whereupon the court brought out that Einiger had known that only the judge could determine the amount of punishment. After a colloquy between court and defense counsel as to what counsel was trying to demonstrate, the court said that the subject had been touched on enough. Counsel went on to establish, without objection or curtailment, that there was another indictment pending against Einiger and concluded cross-examination shortly thereafter.

Appellant claims that examination into Einiger's hope of reward for testifying was abruptly and improperly cut off. It is clear from the record, however, that Einiger was permitted to state whether he had been promised consideration (the answer was no) or told by his lawyer that he "might receive some consideration" (the answer was yes). Thus, the basis for an argument that Einiger had a motive to testify falsely was clearly laid. Appellant cites many cases holding that a trial judge abused his discretion in limiting cross-examination; in most of them, defense counsel was completely barred from eliciting the existence of ulterior motive. The others are distinguishable as presenting stronger justification for allowing further cross-examination than we have here. E. g., in Gordon v. United States, 344 U.S. 414, 73 S.Ct. 369, 97 L.Ed. 447 (1953), the key government witness, who was also awaiting sentence, had been told by the judge who had yet to sentence him in another district that he would be "well advised to tell the probation authorities the whole story even though it might involve others." Soon thereafter, the witness implicated defendants. It was held error to exclude the transcript of the proceedings before the other judge to show the motive of the witness in testifying. Here, the advice to Einiger of his lawyer that he might receive consideration was allowed in evidence. We agree that complete preclusion of cross-examination as to motive for testifying is an abuse of discretion; but beyond that, the issue is whether defense counsel had an opportunity to bring out considerations relevant to motive or bias. Here, counsel was not prevented from adequately establishing such a motive, and the issue was fairly put to the jury in the court's charge.[3] Mahler now claims that in addition to inquiring as to concern over the possible sentence, cross-examination could have covered such other subjects as whether Einiger received consideration in regard to bail or whether the government assisted him in securing a position after his guilty plea. However, these lines of inquiry were not pointed out at all to the trial judge. The trial judge did take umbrage over what he perhaps mistakenly thought was a suggestion that sentencing in the court below could be part of a "deal" and did state, "I think we have touched on it enough." How-

---

2. Cross-examination of Einiger commenced at p. 73 of the transcript; the inquiry under discussion here began at p. 137.

3. "[T]he witness Einiger * * * said that he hoped he would get consideration for it [pleading guilty], and I think Babat said that also. In any event, somebody, to my recollection, said that, and you may take into consideration and, indeed, you must take into consideration in considering their testimony the motive that they might have to tell a story, a story to help themselves in some way, either in the sentence that is to be imposed upon them or in some other way in this case."

ever, after that, counsel established in further cross-examination that Einiger had another indictment pending on which disposition had been made and sought to go no further. Moreover, in cross-examining the salesmen, who were also important government witnesses, no attempt at all was made to establish anything other than that they too had already pleaded guilty, but had not yet been sentenced.[4] Control of cross-examination must ordinarily be left to the discretion of the trial judge; under the circumstances here we do not find an abuse of that power.

■■■ Appellant's other arguments do not require extended comment. He now objects to the court's charge that "it is perfectly obvious to all of you the man in this case with the deepest, greatest interest is the defendant himself." This type of charge has been upheld in the past. United States v. Sullivan, 329 F.2d 755 (2d Cir.), cert. denied, 377 U.S. 1005, 84 S.Ct. 1943, 12 L.Ed.2d 1054 (1964) (court charged defendant is "vitally interested"); Reagan v. United States, 157 U.S. 301, 305, 15 S.Ct. 610, 611, 39 L.Ed. 709 (1895) (Supreme Court noted that defendant has "an interest greater than that of any other witness"). Of course, such a charge may be unfair in a given context, but we have read the entire charge and the instruction was neither unfair nor misleading. The jury was also told that self-interest did not necessarily result in lies, that key government witnesses also had an interest in the outcome of the case, that their testimony and Mahler's both had to be "weighed with a great deal of care," and that the jury had to determine whose version to accept. Apparently, trial counsel for Mahler did not believe that the charge was too extreme since no objection was made below. The claim that it was improper for the government to bring out on direct examination of its key witnesses that they had already pleaded guilty to the conspiracy

is not convincing. The proponent of a witness need not allow such information damaging to his credibility to be first established on cross-examination, and the court adequately charged the jury that the guilty plea by the co-defendants was not to be considered as evidence against Mahler. United States v. Aronson, 319 F.2d 48 (2d Cir.), cert. denied, 375 U.S. 920, 84 S.Ct. 264, 11 L.Ed.2d 164 (1963); United States v. Freeman, 302 F.2d 347 (2d Cir. 1962), cert. denied, 375 U.S. 958, 84 S.Ct. 448, 11 L.Ed.2d 316 (1963).

■■■ Finally, appellant attacks count two of the indictment, which was the substantive count charging violation of 18 U.S.C. § 1001 by Mahler's December 11 testimony. However, his arguments are without merit. In this circuit, it was not necessary for the jury to find, as appellant claims, that the false statements to the SEC were material. United States v. Marchisio, 344 F.2d 653, 666 (2d Cir. 1965); United States v. McCue, 301 F.2d 452, 456 (2d Cir.), petition for rehearing in banc denied, cert. denied, 370 U.S. 939, 82 S.Ct. 1586, 8 L.Ed.2d 808 (1962). Similarly, 18 U.S.C. § 1001 covers oral as well as written statements, and Mahler's testimony was the sort that has been held in this circuit to violate the section. United States v. McCue, supra 301 F.2d at 454–456. It should also be noted that the asserted errors on count two would not, in any event, require reversal because the conspiracy conviction would still stand, and the sentences on the two counts were concurrent. See, e. g., United States v. Romano, 382 U.S. 136, 138, 86 S.Ct. 279, 15 L.Ed.2d 210 (1965); United States v. Miguel, 340 F.2d 812, 814–815 (2d Cir.), cert. denied, 382 U.S. 859, 86 S.Ct. 296, 15 L.Ed.2d 238 (1965); United States v. Benjamin, 328 F.2d 854, 856 (2d Cir.), cert. denied, 377 U.S. 953, 84 S.Ct. 1631, 12 L.Ed.2d 497 (1964).

Accordingly, the judgment of conviction below is affirmed.

---

4. As indicated below, this information was brought out by the government in its direct examination.